IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RODNEY DEWAYNE THOMAS                                                                    PLAINTIFF

        v.                        Civil No. 5:21-cv-05162

LIEUTENANT AMANDA ARNOLD;
LIEUTENANT NOLAN AKE; and
LIEUTENANT KEVIN EAST                                                                      DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff, Rodney D. Thomas ("Thomas"), under the provisions of 42 U.S.C. § 1983. Thomas proceeds *pro se* and *in forma pauperis.* Thomas is incarcerated in the Washington County Detention Center ("WCDC"). Thomas maintains his constitutional rights have been violated by: (1) Defendants moving him to, and continually housing him in, administrative segregation; (2) Defendants' failure to properly investigate a complaint made against him under the Prison Rape Elimination Act ("PREA"); and (3) the denial of access to the law library. Thomas has sued Defendants solely in their individual capacities.

Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation on the pending Motion for Summary Judgment filed by Defendants (ECF No. 23). Thomas has filed a Response (ECF No. 29) and the Motion is ready for decision.

**I.     BACKGROUND**

At his deposition, Thomas testified that prior his incarceration in the WCDC, he had twice

been charged with criminal offenses arising out of sexual contact with another. (ECF No. 24-8 at 3). The first charge occurred while he worked at Piney Ridge, which Thomas described as a "sexual behavior facility for kids." *Id.* at 3. Thomas testified he worked at Piney Ridge as a youth-care worker from May 13, 2013, to the end of 2015, when he was terminated due to an allegation of sexual misconduct. *Id.* at 3-4. Thomas was charged in Washington County Circuit Court with two counts of second-degree sexual assault.[1] In March 2022, he pled to the charges and received ten years' probation. *Id.* at 4. Thomas' second charge arose after he was terminated from Piney Ridge. *Id.* He was charged in Benton County Circuit Court with one count of engaging children in sexually explicit conduct.[2] *Id.* He pled guilty to the Benton County charge on February 15, 2019, and received ten years' probation. *Id.* As a result of these convictions, he is required to register as a sex offender. *Id.*

On February 15, 2019, after he was sentenced in the Benton County case, Thomas was transferred to the WCDC and held pending trial on the Washington County charges. (ECF No. 24-2 at 1); (ECF No. 24-8 at 4). The WCDC "has zero tolerance for any type of sexual abuse or sexual harassment. All complaints of abuse of harassment of a detainee will be investigated and

---

[1] *State v. Thomas,* 72CR-18-1136, was filed in the Washington County Circuit Court. Thomas was charged in a two-count criminal information. Count one charged that on or between January of 2013 and December of 2014, while employed at Piney Ridge, Thomas engaged in touching a minor for the purpose of sexual gratification. Count two charged that on or between January of 2015 and December of 2016, while employed at Piney Ridge, Thomas engaged in touching a minor for purpose of sexual gratification. On March 18, 2022, Thomas entered a negotiated plea of guilty and was sentenced to 120 months of probation. The docket sheet is publicly available at the Arkansas Court Connect website. *Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007)(court may take judicial notice of public records). https://caseinfo.arcourts.gov/cconnect/PROD/public/ck_public_qry_doct.cp_dktrpt_frames?backto=P&case_id=72CR-18-1136&begin_date=&end_date= (accessed August 30, 2022).

[2] *State v. Thomas,* 04CR-18-703, was filed in the Benton County Circuit Court. Thomas was charged in a one-count criminal information with engaging a minor in sexually explicit conduct for use in visual or print medium. The offense date is listed as February 27, 2018. Thomas pled guilty on February 15, 2019, and was sentenced to 10 years' probation and ordered to have no contact with minors.
https://caseinfo.arcourts.gov/cconnect/PROD/public/ck_public_qry_doct.cp_dktrpt_frames?backto=P&case_id=72CR-18-1136&begin_date=&end_date= (accessed August 30, 2022).

the investigation reviewed by the PREA review board." (ECF No. 24-1 at 7).

On April 28, 2019, Inmate Palmer ("Palmer") made a PREA complaint against Thomas about events occurring on April 26th. (ECF No. 24-5 at 1). Palmer alleged Thomas had engaged in oral sex with him. *Id.* Thomas denied anything happened between the two of them. *Id.* Palmer decided to drop the complaint. *Id.* Both Palmer and Thomas were moved to separate housing units. *Id.*

On August 12, 2019, Inmate Linton ("Linton") reported that "sexual things were going on in his cell." (ECF No. 24-5 at 3). Specifically, Linton reported that Thomas and Inmate Hefner ("Hefner") were having a consensual sexual relationship. *Id.* Linton and other cellmates had asked the two to stop their sexual activities but their requests were ignored. *Id.* Hefner denied engaging in a sexual relationship. *Id.* Thomas claimed Linton had been making sexual advances towards Hefner. *Id.* Computer notations--referred to as incompatibles--were placed in the inmate files of Thomas, Hefner, and Linton to indicate they could not harmoniously co-exist. *Id.* Sergeant Partain later spoke with Thomas and he "insinuated that there was some consensual sexual activity." *Id.* at 4. Hefner refused to talk about the situation. *Id.* After reviewing all gathered information, Lieutenant Arnold found the PREA complaint to be unsubstantiated. *Id.* at 5. Lieutenant Arnold noted that the relationship between Thomas and Hefner was consensual. *Id.*

On January 19, 2020, Inmate Schibline ("Schibline") reported that, either three or four days ago, he had been sexually assaulted by Thomas. (ECF No. 24-5 at 6). Schibline indicated that Inmate Isaacson ("Isaacson") had witnessed the sexual assault. *Id.* Later that day, Deputy Cody Rex reported he had been approached by Inmates Baldwin, Linton, and Thomas and they asked

3

for incompatibles to be placed between them and Isaacson and Schibline.  *Id.* at 9.  The request was reportedly made because they believed Schibline and Isaacson were lying about the PREA incident.  *Id.*  They did not want Schibline and Isaacson to be in N block with them because there would be problems.  *Id.*  Incompatibles were placed in the inmate files.  *Id.*

On January 26, 2020, Lieutenant Arnold interviewed Schibline and then notified the Criminal Investigation Division ("CID") of the possible sexual assault.  (ECF No. 24-5 at 7).  The PREA complaint was determined to be "founded" and Thomas was criminally charged with rape a class Y felony under Ark. Code Ann. § 5-14-103(a)(1). [3]  (ECF No. 24-2 at 1).  Incompatibles were placed between Schibline, Thomas, and Isaacson.  (ECF No. 24-5 at 7).  Thomas was moved to administrative segregation and was to remain there "due to the charges stemming from this investigation."  *Id.*

An assignment to administrative segregation is "made with no hearing and will not include any privilege restriction.  The assignment can be indefinite" but is subject to regular review to determine whether the assignment remains appropriate.  (ECF No. 24-6 at 26).  Specifically, the WCDC administrative segregation policy provides:

- Criteria:  administrative segregation shall be employed to separate from the general population detainees who:
    - Cannot adjust to the general population
    - Pose a serious threat to themselves, others, or the security of the detention facility.
    - Present a valid need for protection from other detainees as determined by the Facility Administrator (e.g., former law enforcement personnel).
    - Have a communicable disease.

---

[3] *State of Arkansas v. Thomas,* 72CR-20-410, is currently set for trial on September 26, 2022, in the Circuit Court of Washington County.
https://caseinfo.arcourts.gov/cconnect/PROD/public/ck_public_qry_doct.cp_dktrpt_frames?backto=P&case_id=72CR-20-410&begin_date=&end_date= (accessed August 25, 2022).

- - o   Persons charged with infamous crimes
    - o   Witnesses

- Decision:   The decision to place a detainee in administrative segregation shall be made by the Facility Supervisor on the basis of the following:

    - o   A request for segregation by the detainee.   Such a request shall be made in writing, signed and dated by the detainee.
    - o   Observations or reports from officers of persistently disruptive or potentially disruptive behavior, or abnormal behavior that requires removal of the detainee from the general detainee population.
    - o   A report from the facility physician or nurse.
    - o   Apparent need for protection.
    - o   Recommendation of Judge, Prosecutor, or arresting agency.

(ECF No. 24-6 at 26).

When a detainee is assigned to administrative segregation, his status is "reviewed at least every seven (7) days for the first two (2) months and at least every thirty (30) days thereafter, to determine if return to normal detention is possible.[4]"   (ECF No. 24-6 at 26-27).   The following factors are considered during review:

- Whether or not the conditions or circumstances, which led to the segregation, still exist.
- The officers' observations of the detainee's behavior, attitude, and physical condition during segregation.
- Any change in the risk presented to the detainee by placement in the general population.
- The presence or absence of continued risk to the general population if the detainee is removed from segregation.

(ECF No. 24-6 at 27).   The records indicate Thomas' status was reviewed regularly.   (ECF No. 24-5 at 10-39).

According to Defendants' count, Thomas submitted seventy-nine requests and/or

---

[4] In Corporal Mulvaney's affidavit, he states "detainees placed in administrative segregation shall be reviewed and documented at least every 15 days for continuance of status."   (ECF No. 24-1 at 2).   However, the actual policy language is quoted above.

grievances about being housed in administrative segregation between January of 2020 and February of 2022. (ECF No. 24 at 4). Various WCDC personnel responded to his grievances. While the wording of each response is different, the gist of the responses was that Thomas was in administrative segregation for the safety and security of the facility. *See e.g.,* (ECF No. 24-3 at 1). Thomas continued to deny that he had raped anyone; objected to the fact that no one had interviewed him or his witnesses; felt they were withholding a report made by Lieutenant Arnold; requested to be placed back in general population; and complained he was being treated as if he was guilty of rape. *See e.g., id.* at 2-12, 32, 37-38. Thomas felt other inmates who had engaged in conduct that showed violent tendencies were released from administrative segregation. *See e.g., id.* at 16, 46, 55, 66. Thomas wondered if the reason he was still in administrative segregation might have to do with his race or sexual preference. *Id.* at 16 & 40. He was repeatedly advised that he was in administrative segregation because of the PREA incident which occurred within the WCDC and resulted in him being charged with rape. *Id.* at 17, 21, 25, & 40. Once criminal proceedings on the rape charge were complete, Thomas was advised that they would again review his housing assignment. *See e.g., id.* at 27, 42, 67, & 104.

In January of 2022, Thomas was allowed to have a cell-mate. (ECF No. 24-3 at 71). According to Sergeant Lunsford, there was "no room for [the] cell mate elsewhere in the facility. *Id.* at 100. His cell-mate, Inmate Trustin ("Trustin"), was also in administrative segregation due to a PREA investigation. (ECF No. 34-8 at 9).

Thomas testified that he did not believe Lieutenant Arnold properly investigated the January 19th PREA complaint before it was turned over for prosecution. (ECF No. 24-8 at 6). Thomas asserts that she did not speak with him and although she said she spoke with the witnesses,

6

no report of her interaction with any of the witnesses has been provided Thomas in discovery in either this civil case or his criminal case. *Id.* If Lieutenant Arnold had spoken to his witnesses before turning the matter over to CID, Thomas believes that the PREA charge would have been found to be unsubstantiated. *Id.* at 6-7. Thomas felt he had been "picked on" or treated unfairly since being confined to administrative segregation. *Id.* at 6. Thomas also objected to the fact that when he specifically addressed his grievance to one officer, another officer would respond. *Id.* at 11.

Thomas is aware that the WCDC has "zero tolerance" for sexual contact between inmates. (ECF No. 24-8 at 7). He understands that the PREA was designed to "eliminate other inmates being assaulted by other inmates sexually." *Id.* Thomas conceded three PREA complaints had been made against him. *Id.* With respect to the second PREA complaint, Thomas admitted to engaging in sexual contact but maintained it was consensual. *Id.* He has received no disciplinary write ups with respect to the PREA violations. *Id.* While in administrative segregation, inmates still have their privileges including visits, snack wagon, and commissary. *Id.* at 8. Unless there are technical difficulties, administrative segregation inmates also have access to the kiosk and to tablets during their hour out of their cell. *Id.* This is in contracts to inmates in disciplinary segregation who have all their privileges taken away. *Id.*

Prior to his incarceration in the WCDC, Thomas had received no treatment for any mental illness. (ECF No. 24-8 at 5). However, due to his long incarceration in administrative segregation, Thomas testified that it "messed with [his] mind" being housed alone in a cell so long with no resources—barely even getting access to the book cart. *Id.* at 10. Thomas testified that he began to have minor panic attacks when he was around other people. *Id.* Thomas indicated

he did not seek medical treatment because he is not a fan of taking pills and perhaps becoming addicted. *Id.* He did, however, talk to the therapist who provided him with a journal to write in and a book. *Id.* At some point, the WCDC quit giving out journals. *Id.* However, Thomas testified that having a cell-mate did help out a "little bit." *Id.* Thomas was also able to talk to other people by yelling through the vent. *Id.*

## II. APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Com. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*

8

*v. Harris*, 550 U.S. 372, 380 (2007).

## II. DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) Thomas is housed in administrative segregation pursuant to WCDC policy; (2) Thomas had no due process rights since he was not being disciplined; (3) there is no private right of action under the PREA; (4) Thomas was not entitled to any particular level of investigation into the PREA allegation by WCDC staff; (5) Thomas was not denied access to the courts; and (6) Defendants are entitled to qualified immunity.

### A. Placement in Administrative Segregation

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535 (1979). In determining whether "the conditions of pretrial detention are unconstitutionally punitive, [the court must] review the totality of the circumstances of a pretrial detainee's confinement." *Morris v. Zefferi,* 601 F.3d 805, 809 (8th Cir. 2010). Specifically,

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* (quoting *Bell,* 441 U.S. at 538-39)(cleaned up).

In *Whitley v. Albers,* 475 U.S. 312 (1986), the Supreme Court stated that:

> Prison administrators . . . should be accorded wide-ranging deference in the adopting and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventative measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id.* at 321-322 (cleaned up).

Thomas, having pled guilty to a sex offense in Benton County,[5] and having pending two counts of sexual assault in Washington County, was housed with other detainees who were charged with sexual offenses or identified as sex offenders. With regard to the second complaint against Thomas under the PREA, Thomas admitted to having a consensual sexual relationship. Thomas testified he was not disciplined in anyway as a result of the PREA complaints.

Thomas admitted WCDC had zero tolerance for sexual conduct. While his confinement in administrative segregation has been lengthy, it was due to Thomas' violation of WCDC's zero-tolerance policy and to the fact that he was criminally charged with raping another inmate. Defendants' obligation is to protect not only Thomas but all inmates. Thomas' privileges were not taken away; he still had access to commissary, the snack cart, visitation, the kiosk, and tablets. As Thomas is charged with raping another inmate, there is a legitimate governmental interest in keeping Thomas separated from other inmates. No process is due when the decision to place an inmate in administrative segregation is based on legitimate interests such as the protection of

---

[5] On February 15, 2019, Thomas was sentenced to ten years' probation in the Benton County case. No prison term was imposed. Thus, on the dates of all three PREA complaints, he was a pretrial detainee since he was incarcerated solely because of the pending Washington County criminal charges.

Thomas and other detainees.  *See e.g., Jones v. Mabry,* 723 F.2d 590, 594 (8th Cir. 1983)("As long as there is a procedure for reviewing periodically the situations of inmates who are in administration segregation . . . due process is satisfied.").  There is no genuine issue of material fact as to whether Defendants confined Thomas to administrative segregation for punitive reasons rather than for institutional security and thus Defendants are entitled to summary judgment on this claim.  Further, having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### B. Claims under the PREA

Section 1983 does not create any substantive rights.  Rather, it provides a remedy for violations of constitutional rights or rights created under federal law.  *Tarsney v. O'Keefe*, 225 F.3d 929, 939 (8th Cir. 2000).  The PREA authorized the federal government to give grants to prisons and detention facilities that implement procedures designed to reduce the number of prison rapes.  34 U.S.C. §§ 30301-30309.  While there appears to be no Eighth Circuit decisions on point, it is clear the PREA does not create a private cause of action.  *Johnson v. Garrison,* 859 F. App'x 863, 864 (10th Cir. 2021); *Bowens v. Wetzel,* 674 F. App'x 133, 137 (3d Cir. 2017); *Krieg v. Steele*, 599 F. App'x 213, 232-33 (5th Cir. 2015); *Wilmoth v. Sharp*, No. 6:15-cv-06057, 2018 WL 1092031, *3 (W.D. Ark. Feb. 27, 2018).  The Court of Appeals for the Eleventh Circuit has held that a violation of the PREA is not a *per se* violation of the Eighth Amendment.  *Cox v. Nobles,* 15 F.4th 1350, 1361 (11th Cir. 2021), *cert. denied,* 142 S. Ct. 1178 (2022).

Furthermore, Thomas' argument that the Defendants violated the WCDC's own

11

procedures with respect to the investigation of the PREA complaint against Thomas, does not state a claim of constitutional dimension. Prisoners do not have a constitutional right to enforce compliance with internal prison rules or regulations. *See e.g., Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003)("there is no constitutional liberty interest in having . . . prison officials follow prison regulations"); *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir. 1997)("there is no § 1983 liability for violating prison policy"). Therefore, any claim raised under the PREA, or for violations of the WCDC's rules or procedures in connection with investigating complaints under the PREA, fail as a matter of law. Defendants are entitled to summary judgment on these claims. Further, having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout*, 583 F.3d at 564.

### C. Denial of Access to Courts

The Supreme Court has held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). The constitutional requirement of access to the courts may be satisfied in many ways, including prison libraries, jailhouse lawyers, private lawyers on contract with the prison, or some combination of these and other methods. *See Bear v. Fayram*, 650 F.3d 1120, 1123 (8th Cir. 2011). The Supreme Court later clarified that *Bounds* "did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).

In this case, Thomas makes the bare allegation that he did not have access to a law library. However, during his deposition, he testified that the law library was available on the kiosk.

Except for brief periods of time when the kiosk was not working properly, he had access daily to the kiosk and to tablets. (ECF No. 24-8 at 14). Thomas testified inmates are only allowed to use the kiosk for thirty minutes at a time. *Id.* After that, inmates must wait fifteen minutes to log back on. *Id.* On the tablet, inmates only get fifteen minutes unless they are "paying a dollar to be able to be on it for an hour." *Id.* Inmates must wait three hours to log back in. *Id.*

While Thomas' use of the law library was limited, as a general principle, "[t]o prove a violation of the right of meaningful access to the courts, a prisoner must establish that the [county] has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted); *see also Klinger v. Dep't. of Corr.,* 107 F.3d 609, 617 (8th Cir. 1997)(to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic). To establish such hindrance, there must be some evidence that conduct by prison officials adversely affected the outcome of a prisoner's litigation. *See Entzi v. Redmann,* 485 F.3d 998, 1005 (8th Cir. 2007). Thomas has not alleged the existence of any actual injury. This is fatal to his claim. Defendants are entitled to summary judgment on this claim. Further, having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout*, 583 F.3d at 564.

## IV.   CONCLUSION

For the reasons stated, it is recommended that the Defendants' Motion for Summary Judgment (ECF No. 23) be **GRANTED** and this case be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen days from receipt of the Report and Recommendation in**

13

**which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of August 2022.

*s/ Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

14